(No. 48414.— )

PUBLIC FINANCE CORPORATION, Appellee, v.
LUELLA DAVIS, Appellant.

*Opinion filed Nov. 15, 1976.—Rehearing denied Jan. 28, 1977.*

KLUCZYNSKI, J., took no part.
DOOLEY and CLARK, JJ., dissenting upon denial of rehearing.

Lois J. Wood, of Land of Lincoln Legal Assistance Foundation, Inc., of East St. Louis, for appellant.

John F. O'Connell, of O'Connell & Waller, of Belleville, for appellee.

MR. JUSTICE RYAN delivered the opinion of the court:

In this case Luella Davis (Davis), the defendant and counterclaimant, seeks to recover from Public Finance Corporation (Public Finance), plaintiff and counterdefendant, under the allegations in her amended counterclaim for mental anguish and emotional distress allegedly caused by the agents of Public Finance in attempting to collect money which Davis owed. The circuit court of St. Clair County held that the amended counterclaim failed to state a cause of action. The appellate court affirmed. (36 Ill. App. 3d 99.) We granted leave to appeal.

From the pleadings it appears that Davis was indebted to Public Finance on a promissory note executed by her and secured by a security interest in her household goods. She made regular payments on the obligation until August 1, 1974. On February 24, 1975, Davis then being in default, Public Finance filed a complaint seeking judgment against her for the balance due on the note. Davis counterclaimed and, following the allowance of a motion to dismiss the counterclaim, filed an amended counterclaim which is in two counts, both counts seeking recovery on the theory of intentional infliction of severe emotional distress. The sole question to be decided is whether the amended counterclaim stated a cause of action. We find that it did not.

In *Knierim v. Izzo* (1961), 22 Ill. 2d 73, this court recognized the intentional causing of severe emotional distress as a separate and additional tort which one author has been prompted to call a "new tort." (Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich. L. Rev. 874 (1939).) Although this tort was not recognized in the 1934 Restatement of Torts, the 1948 supplement contained an amended section 46 recognizing

the existence of a cause of action based on this theory. (Restatement of Torts sec. 46 (Supp. 1948).) The reason for the change as partially stated in the supplement is: "The change in Section 46 is necessary in order to give an accurate Restatement of the present American law. There is a definite trend today in the United States to give an increasing amount of protection to the interest in freedom from emotional distress." Although the 1948 supplement contained the caveat that "[t]he [American Law] Institute expresses no opinion as to whether one who recklessly causes severe emotional distress to another is or is not liable for it," the Institute, in Restatement (Second) of Torts, section 46 (1965), recognizes the existence of a cause of action for severe emotional distress caused by intentional or reckless conduct. *Knierim,* which predated the second Restatement, by innuendo adopted the viewpoint of the 1948 supplement recognizing only a cause of action based on *intentional* conduct. (See Note, *Torts —Intentional Infliction of Mental Suffering: A New Tort in Illinois,* 11 De Paul L. Rev. 151 (1961).) Although recklessness has been rejected in one jurisdiction as a basis for recovery for severe emotional distress (see *Alsteen v. Gehl* (1963), 21 Wis. 2d 349, 124 N.W.2d 312), we do not find the reason for that decision applicable in Illinois. We therefore will test the two counts of the amended conterclaim by the requirements of the cause of action as stated in section 46 of the second Restatement, the decisions of other jurisdictions recognizing the cause of action and by the authors on the subject. See Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv. L. Rev. 1033, 1059 (1936); Prosser, Law of Torts sec. 12 (4th ed. 1971).

The extensive comments and illustrations to section 46 are helpful in delineating the conduct which gives rise to this cause of action. First, the conduct must be extreme and outrageous. The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppres-

sions or trivialities. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency ***." Restatement (Second) of Torts, sec. 46, comment d (1965).

Second, infliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be *severe*. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term "emotional distress," these mental conditions alone are not actionable. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity." Comment *j*. See also Prosser, Law of Torts sec. 12, at 54 (4th ed. 1971).

Third, reckless conduct which will support a cause of action under the rules stated is conduct from which the actor knows severe emotional distress is certain or substantially certain to result. (Comment *i*.) Liability extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it. Prosser, Law of Torts 60 (4th ed. 1971).

Fourth, as is stated in comment *e*, the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests. This interpretation of the rule is applicable to collecting creditors and would apply to a creditor in its attempt to collect a lawful obligation.

Count I of the amended counterclaim alleges the

conduct of Public Finance which Davis claims entitles her to recover. Stripped of the conclusions, it is charged that on or about September 1, 1974, Davis informed Public Finance she was no longer employed, was on public aid and did not have enough money to make regular payments on her obligations; that in order to collect the account Public Finance from September 1, 1974, to April 4, 1975, called Davis several times weekly, frequently more than once a day; that in order to collect the account agents of Public Finance went to Davis' home one or more times a week; that on October 15, 1974, when Davis' daughter was in the hospital, an agent of Public Finance, in order to collect the account, called the defendant at the hospital; that on that day Davis informed the agent of the severity of her daughter's condition, that she, herself, was sick and nervous and asked that Public Finance refrain from calling her at the hospital; that on the same day an agent of Public Finance again called Davis at the hospital; that after an employee of Public Finance induced Davis to write a check and promised that the check would not be processed, Public Finance phoned an acquaintance of Davis and informed her that Davis was writing bad checks; that in November 1974 an employee of Public Finance called at Davis' home and after being told that Davis had no money with which to make a payment, with Davis' permission, used her phone to call Public Finance and to describe and report the items of Davis' household goods; that on that day the employee "failed or refused" to leave Davis' home until her son entered the room.

Count II realleges the conduct of Public Finance alleged in count I and further alleges that Davis suffered from hypertension and a nervous condition; that she was particularly susceptible to emotional distress; that she had frequently informed agents of Public Finance of her condition and that Public Finance had notice that Davis was particularly susceptible to emotional distress.

The conduct alleged is not of such an extreme and

outrageous nature as to constitute a basis for recovery under the theory alleged. Davis was legally obligated to Public Finance and was in default in making the payments. As stated in Restatement (Second) of Torts, section 46, comment *g*, in such a case the actor is not liable "where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistance is certain to cause emotional distress." A creditor must be given some latitude to pursue reasonable methods of collecting debts even though such methods may result in some inconvenience, embarrassment or annoyance to the debtor. The debtor is protected only from oppressive or outrageous conduct. *Dawson v. Associates Financial Services Co. of Kansas, Inc.* (1974), 215 Kan. 814, 529 P.2d 104; *Norris v. Moskin Stores, Inc.* (1961), 272 Ala. 174, 132 So. 2d 321.

In cases wherein courts have permitted the action to be brought or have sustained recovery for severe emotional distress, the collecting tactics of the creditor have involved the use of abusive and vituperative language, shouting and railing at the debtor, repeated threats of arrest and ruination of credit, threats to appeal to the debtor's employer to endanger his employment and accusations of dishonesty. "[L]iability usually has rested on a prolonged course of hounding by a variety of extreme methods." Prosser, Law of Torts 57 (4th ed. 1971). See *Barnett v. Collection Service Co.* (1932), 214 Iowa 1303, 242 N.W. 25; *LaSalle Extension University v. Fogarty* (1934), 126 Neb. 457, 253 N.W. 424; *Warrem v. Parrish* (Mo. 1969), 436 S.W.2d 670; *Rugg v. McCarty* (1970), 173 Colo. 170, 476 P.2d 753; Annot., 15 A.L.R.2d 108, 158-163 (1951). See also Annot., 46 A.L.R.3d 772 (1972); Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich. L. Rev. 874 (1939).

Returning to the allegations in count I we note that Davis alleges that the course of conduct pursued was in order to collect the account. This Public Finance had a

right to do, as long as the methods employed were not outrageous. As to the numerous telephone calls, there is no allegation as to what was said by the person making the calls. The same is true of the allegations of the several visits to Davis' home and of the calls to Davis at the hospital. Davis has not alleged that the agents of Public Finance used abusive, threatening or profane language or that they conducted themselves other than in a permissible manner. There is no allegation concerning these calls or the visits to the house that can serve to characterize Public Finance's conduct as extreme or outrageous. The mere fact that a second call was made to Davis at the hospital after she had requested that they not call her there cannot be so considered, since there is no allegation as to what was said or even that the second call was for the purpose of collecting the past due obligation.

As to the visit of an employee of Public Finance to Davis' home and using her phone to call Public Finance and to inventory and describe her household goods, again we must consider that her obligation was past due and that it was secured by the household goods. Also the allegation that the employee of Public Finance "failed or refused" to leave until Davis' son entered the room contains only an innuendo and not an allegation of any threatening or coercive conduct which could be called outrageous.

We consider the most serious allegation to be the charge that Public Finance induced Davis to write a check for the amount owed with the assurance that the check would not be presented for payment and then subsequently phoned Davis' acquaintance and informed her that Davis was writing bad checks. This conduct was wrong and no doubt caused Davis considerable embarrassment and distress. However, this appears to be a single isolated act. In *Lewis v. Physicians and Dentists Credit Bureau, Inc.* (1947), 27 Wash. 2d 267, 273, 177 P.2d 896, 899, the court stated that persons "who do not pay their bills cannot object to some publicity in connection with

attempts to collect them; their tender sensibilities are protected only from 'undue or oppressive publicity.' " Also, in comment *j* to section 46 it is stated that the intensity and duration of the distress are factors to be considered in determining the severity of the emotional distress. We do not consider that the specific allegation of this single impermissible act constitutes extreme and outrageous conduct calculated to cause severe emotional distress.

There can be no doubt that the conduct of the employees of Public Finance disturbed Davis and possibly caused her emotional distress. The allegations demonstrate that the employees were persistent in their efforts to collect the past due obligation and possibly were persistent to the point of being annoying; however, with the possible exception noted, count I contains no allegation of extreme or excessive conduct. We must therefore hold that count I does not state a cause of action for severe emotional distress.

Even assuming, as we must under the allegations of count II, that Public Finance knew that Davis suffered from hypertension and was nervous the conduct alleged is not actionable. Knowledge that another is peculiarly susceptible to emotional distress may make a person's conduct actionable when it otherwise would not be. "The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." (Restatement (Second) of Torts sec. 46, comment *f.*) However, comment *f* emphasizes that major outrage, even under such circumstances, is still essential to the tort. As stated above, the complaint contains no allegations of abusive or threatening language or conduct coercive in nature. Public Finance was attempting to collect a legal obligation from Davis in a permissible though persistent and possibly annoying manner.

For the reasons stated we hold that counts I and II of

the amended counterclaim do not state a cause of action for either intentional or reckless infliction of severe emotional distress. The judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

Dissenting Opinion Upon Denial Of Rehearing.

MR. JUSTICE DOOLEY, dissenting:

The sole issue is whether the amended counterclaim states a cause of action. The dismissal order tells us that the pleading did not state a cause of action under *Knierim v. Izzo* (1961), 22 Ill. 2d 73.

What are the allegations which counterplaintiff seeks the opportunity to prove? In count I of her amended counterclaim, she alleges that on September 1, 1974, when she had discontinued her regular payments, she informed Public Finance that she was unemployed and her sole income was from public aid; that from September 1, 1974, through April 4, 1975, the finance company engaged in an "outrageous course of conduct, \*\*\* with the intent of causing severe emotional distress \*\*\* or in reckless disregard of the possibility of causing severe emotional distress to her." She specified during this seven-month period this conduct consisted of calling her several times weekly and frequently more than once daily and harassing her "by going to her home one or more times."

In October 1974, while her daughter was confined to the hospital with a brain tumor, an employee of Public Finance called her at the hospital while she was awaiting word of her daughter's condition, at which time she informed Public Finance's employee of the severity of the daughter's condition and that she herself was sick and had nervous problems. She asked him to refrain from making

further calls to her at the hospital, but nonetheless the said employee made an additional call to her at the waiting room at the hospital.

She further alleges that in November 1974, after advising the Public Finance employee there were no funds in her checking account, she was induced to write a check to the corporation to demonstrate "good faith." It was represented that the check would not be processed. However, the company employee telephoned an acquaintance of counterplaintiff and informed her that counterplaintiff was writing bad checks.

She further charged that in October or November of 1974 the finance company's employee, after being advised counterplaintiff was without funds, was permitted to use her telephone to report to the finance corporation counterplaintiff's household goods, and at that time the employee refused to leave counterplaintiff's home until her son entered the room. And on that particular day as a proximate result of the conduct of the Public Finance employee, counterplaintiff became ill and had to summon a doctor. She alleged she suffered physical and mental anguish and *severe* emotional distress as a result of the foregoing conduct of the finance company.

Her second count alleges that during this seven-month period she suffered from hypertension as well as a nervous condition and was particularly susceptible to emotional distress. In October 1974 and on subsequent occasions thereafter, she so informed Public Finance Corporation's employee of her nervous condition, and in January 1975 advised a Public Finance Corporation employee that she was pregnant. She thus alleges knowledge by the finance company of her susceptibility to emotional distress. Count II also embraced the same causation claim as is found in count I.

On a motion to dismiss we must assume the charges to be true.

In *Knierim v. Izzo* (1961), 22 Ill. 2d 73, we

recognized the tort arising out of the intentional infliction of severe emotional distress. While it is true that the allegations there involved a threat of murder to plaintiff's husband, as well as a fulfillment of that threat, nonetheless the principle with which we are dealing was recognized. All arguments against this rule of law were considered in detail and each was rejected. *Knierim* is the yardstick with which to measure the pleading. *Knierim's* progeny and its genesis are both enlightening.

In *Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1, *Knierim* was held to be the basis of a cause of action against an insurer by a wife, the beneficiary of the husband's policy, upon allegations that the insurer repeatedly refused to make payment although it knew or should have known of the decedent's accidental death, the wife's financial needs, and her resulting mental distress arising out of its refusal. In reversing a judgment entered upon the pleading, the reviewing court observed:

"We have no doubt, in view of Knierim v. Izzo, 22 Ill. 2d 73, 174 N.E.2d 157 (1961), that the Illinois Supreme Court would sustain plaintiff's complaint against Insurer's motion to dismiss." 470 F.2d 1, 3.

*Eckenrode* pointed out how this court in *Knierim* referred to *State Rubbish Collectors Association v. Siliznoff* (1952), 38 Cal. 2d 330, 240 P.2d 282, where the California court, in an opinion by Justice Roger Traynor, recognized this tort for the first time. Siliznoff could recover from the cross-defendant Rubbish Collectors Association for mental distress caused by severe threats to beat him up, destroy his truck and put him out of business unless Siliznoff agreed to make certain payments to the Association.

So also alluded to in *Eckenrode* was *Fletcher v. Western National Life Insurance Co.* (1970), 10 Cal. App. 3d 376, 89 Cal. Rptr. 78, which held that insurance companies' bad faith refusals to make payment under a

disability policy were tortious in character and could provide the basis for an action against the carrier for intentional infliction of emotional wrong. The refusals there were willfully employed by the carrier together with threatening and false letters directed to the insured to cause him to surrender his policy or settle on its terms a nonexistent dispute.

The essence of this tort is wrongful intent. Conduct which is legal may become wrongful when accompanied by an illegal intent as well as a harmful result. It is proper to operate an automobile; it is illegal to do so with the intent of injuring another. As was observed in *Bowden v. Spiegel, Inc.* (1950), 96 Cal. App. 2d 793, 795, 216 P.2d 571, 572, "The important elements are that the act is intentional, that it is unreasonable, and that the actor should recognize it as likely to result in illness. Given these elements the modern cases recognize that mere words, oral or written, which result in physical injury to another are actionable."

In 1936 Magruder, discussing "Mental and Emotional Disturbance in the Law of Torts" in 49 Harv. L. Rev. 1033, observed at page 1067: "No longer is it even approximately true that the law does not pretend to redress mental pain and anguish 'when the unlawful act complained of causes that alone.' If a consistent pattern cannot yet be clearly discerned in the cases, this but indicates that the law on this subject is in a process of growth."

Twenty years later, in 1956, Professors Harper and James stated:

"*** [A]lthough ordinarily there may be no recovery for disagreeable emotional disturbance alone negligently caused, there is, in modern law, a distinct tendency to allow recovery for such disturbances if they, in turn, result in foreseeable physical injury or illness.***

Where severe mental suffering is intentionally caused and it is of such a kind as is likely to and does cause bodily illness, the case for recovery is obviously stronger and the law today generally allows it ***." 1 Harper and James, Torts 665.

Eight years later, in 1964, Prosser noted: "It is not until comparatively recent years that there has been any general admission that the infliction of mental distress, standing alone, may serve as the basis of an action, apart from any other tort. In this respect, the law is clearly in a process of growth, the ultimate limits of which cannot as yet be determined." Prosser, Torts sec. 11, at 41-42 (3d ed. 1964).

The general thinking that the law should protect emotional tranquility against intentional invasion prompted the American Law Institute as long ago as 1947 to amend section 46 of the Restatement of the Law of Torts to provide: "One, who without a privilege to do so, intentionally causes severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it."

In comments to this section the following appears:

"An intention to cause severe emotional distress exists when the act is done for the purpose of causing the distress or with knowledge on the part of the actor that severe emotional distress is substantially certain to be produced by his conduct. [Citation.] If an act is done with the requisite intention, it is immaterial that the actor is not inspired by any personal hostility to the other ***.

The interest in freedom from severe emotional distress is regarded as of sufficient importance to require others to refrain from conduct intended to invade it. Such conduct is tortious." Restatement of Torts (Supp. 1948).

Bill collectors have long occupied a special niche in the law of torts recognizing recovery for intentional infliction of emotional disturbances. (See *Clark v. Associated Retail Credit Men* (1939), 70 App. D.C. 183, 105 F.2d 62; *Curnutt v. Wolf* (1953), 244 Iowa 683, 57 N.W.2d 915, and Annot., 46 A.L.R.3d 772 (1972). In 91 A.L.R. 1495 (1934) are collected some of the older cases.

We agree with the majority that in measuring this intentional conduct it must be "extreme and outrageous" except that a lesser grade of conduct will support a cause of action where the actor has knowledge of the fact that

emotional distress is substantially certain to result. The emotional distress, we further agree, must be severe. However, neither is a problem here since the amended counterclaim also alleged the finance company engaged in an outrageous course of conduct with the intention of causing severe emotional distress and as a proximate result counterplaintiff sustained severe emotional distress.

This pleading, it must be remembered, was dismissed for failure to state a cause of action. "Outrageous," "intentional," and "severe" are words of common understanding. So long as they are requisite to the statement of a cause of action, they are proper in a pleading of this nature. The conduct described as such must be considered in the context of time, place, surrounding circumstances, and knowledge by the actor that it will reasonably cause emotional distress. Not to be overlooked is the person making the appraisal. Certainly the dowager would consider conduct "highly outrageous" which the youth would regard as prosaic. So long as reasonable men might differ in their evaluation of the character of the conduct, the judicial function is exhausted.

The majority opinion would segregate count I from count II, which alleges the plaintiff's actual knowledge of counterplaintiff's condition of ill health by counterdefendant. But, if one or more counts in a complaint are good, a motion to dismiss will not be sustained. (*Barzowski v. Highland Park State Bank* (1939), 371 Ill. 412, 416; *Stenwall v. Bergstrom* (1947), 398 Ill. 377, 383.) Accordingly, on this motion to dismiss the complaint, count II should not have been segregated from count I. Each was a substantial part of the amended counterclaim which should not have been thus dismembered.

So also we do not believe that on a motion to dismiss the court should engage in an attenuation process. Thus the majority observes: "This conduct [the finance company inducing the counterplaintiff to write what it knew was a bad check] was wrong and no doubt caused Davis

considerable embarrassment and distress. However, this appears to be a single isolated act." Yet it was intentional and a fragment of the panorama described by pleading. This conduct is far more egregious than those instances where on one occasion abusive language was employed or a threatening letter written. Yet one instance sufficed. See *Bennett v. City National Bank & Trust Co.* (Okla. App. 1975), 549 P.2d 393, and *Christensen v. Swedish Hospital* (1962), 59 Wash. 2d 545, 368 P.2d 897.

Again we find a statement difficult to reconcile with the result reached by the majority. "There can be no doubt that the conduct of the employees of Public Finance disturbed Davis and possibly caused her emotional distress." But this allegedly outrageous and intentional conduct caused emotional distress. What more could be exacted on a motion to dismiss?

The majority also notes that, "as to the numerous telephone calls, there is no allegation as to what was said by the person making the calls." And again: "The mere fact that a second call was made to Davis at the hospital after she had requested that they not call her there cannot be so considered, since there is no allegation as to what was said or even that the second call was for the purpose of collecting the past due obligation." Obviously, to exact in a complaint the language in the telephone call would require pleading evidence—a practice long condemned by this court (*People ex rel. Hamlin v. Payson* (1904), 210 Ill. 82). Moreover, the Civil Practice Act only requires a "plain and concise statement of the pleader's cause of action, counterclaim, defense, or reply." Ill. Rev. Stat. 1975, ch. 110, par. 33.

Courts are not so naive as to believe that a bill collector makes numerous telephone calls at inappropriate times and places to endear himself to the particular debtor.

The majority manifests the unwholesome tendency to transmute considerations of fact into considerations of law. This practice is the belittling sin of the law of tort.

The House of Representatives of the United States the other day passed a bill directed at the prohibition of abuses by debt collectors, "A Bill to Amend the Consumer Credit Protection Act to Prohibit Abusive Practices by Debt Collectors," H.R. 5294, 95th Cong., 1st Sess. Amongst the condemned practices were communication with the consumer more than two times during every 7-calendar-day period, communications with third persons without the consumer's consent or that of a court of competent jurisdiction, and failing to cease communications when the consumer refuses to pay or discuss the account. Harassment or intimidation are also anathema under this bill. In the catalog of harassments and intimidation is the making of threatening telephone calls to a consumer or calling any person "repeatedly or constantly," as well as the acceptance by a debt collector of a post-dated check.

A debt collector who violates the proposed law incurs a civil liability which includes reasonable attorney's fees.

It would seem that the action of the House of Representatives is not a case of *deja vu*. Indeed, this case comes within the full litany of the prohibition of the abuses the Congress of the United States is attempting to correct. As judges, we can hardly be immune to the course of events engulfing the lives of the public.

We believe the judgment of dismissal of the counterclaim ought to be reversed and the cause remanded for trial.

MR. JUSTICE CLARK joins in this dissent.